UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HIGHLINE CAPITAL MANAGEMENT, LLC,<br><br>        *Plaintiff*,<br><br>        - against -<br><br>HIGH LINE VENTURE PARTNERS, L.P., HIGH LINE VENTURE PARTNERS II, L.P., HIGH LINE VENTURE PARTNERS GP, LLC, HIGH LINE VENTURE PARTNERS GP II, LLC, and SHANA FISHER,<br><br>        *Defendants*. | Civil Action No. 15-cv- 660 (VEC) |

## DEFENDANTS' PRE-TRIAL STATEMENT

Defendants, High Line Venture Partners, L.P., High Line Venture Partners II, L.P., High Line Venture Partners Gp, LLC, High Line Venture Partners Gp II, LLC, and Shana Fisher (collectively, "HLVP"), by and through their undersigned counsel, hereby submit the following pre-trial statement.

### I.    PRELIMINARY STATEMENT

Plaintiff Highline Capital Management, LLC ("HCM"), a hedge fund managing investments of approximately $2–3 billion, seeks to be the only entity in the financial industry to have a name that uses the term "Highline," or names that sound like or contain iterations of the word "Highline." That desire has led to the present lawsuit, in which HCM is seeking an injunction to force High Line Venture Partners ("HLVP") — a small venture capital partnership which invests only its own funds in technology start-up companies — to change its name. Unfortunately for HCM, however, trademark law does not guarantee it the sole use of "Highline" and like-sounding words, even within the (vast) financial industry. Rather, trademark law simply prevents third party marks *that are likely to cause consumer confusion* from being used *in*

1

*connection with the provision of goods and services*. Further, in order to obtain an injunction, HCM would have to prove real, imminent, irreparable harm resulting from HLVP's use of its trade name. As discussed below, these basic limitations on trademark law (and the law of injunctions) are fatal to HCM's case.

*First*, HCM's Lanham Act claims fail because HLVP does not use its trade name, "High Line Venture Partners" in connection with the provision of goods or services. Rather, as explained below, HLVP is a vehicle that invests only its own money in technology start-up companies, hoping to eventually turn a profit for itself. This type of self-interested and self-contained investor, regardless of its name, is not providing commercial services of the sort with which the Lanham Act concerns itself.

S*econd*, HCM's claims fail because consumers are not confused, and are not likely to be confused by HLVP's trade name. Indeed, HCM has not identified (and will not produce at trial) any investor or potential investor (*i.e*., a relevant consumer) who has actually thought that HVLP was affiliated with HCM or its services, or vice versa. Nor will HCM present a survey demonstrating that consumer confusion is likely. Rather, the evidence will show that HVLP is not causing confusion among consumers.

HLVP and HCM peacefully coexisted (and were not even aware of one another's existence) for over four years before this suit arose. Not once in this time did any consumer contact HVLP or HCM about the other. This is not surprising given the different financial spheres in which the two companies operate. HCM is a hedge fund that invests substantial amounts of money on behalf of its customers in mid and large-cap, publicly-traded companies. In contrast, HVLP has no outside customers, and makes relatively small investments of its own money in early-stage, non-public start-up technology companies. Other than participating in the

act of investing money, there is virtually no similarity between what these companies do or who they serve.

Another reason that consumers have not been confused, and are not likely to be confused, is that the consumers HCM deals with are, by definition, highly sophisticated. The U.S. Securities and Exchange Commission only allows hedge funds, including HCM, to accept investments from "accredited investors" or "qualified purchasers." The thorough, months-long due diligence process through which these individuals vet hedge funds like HCM prior to making the multi-million dollar decision to invest further prevents the possibility of any confusion.

It is worth noting, with respect to possible confusion, that HVLP has not attempted in any fashion to trade off of HCM's name. High Line Venture Partners is so named because its offices overlook the famed High Line Park, in New York City, and it is a partnership that invests venture capital. Its logo looks nothing like HCM's, and HLVP conducts no advertising. As it so happens, HCM adopted the word "Highline" in its name to reference another geographic feature, a famous ski trail in Colorado. It turns out that this is quite common in the financial industry, and there are legions of similar sounding entities (including various other "Highline" entities) that peacefully coexist, another testament to the sophistication of investors, and the futility of HCM's attempts to corner the market on the words "Highline" and "High Line."

Finally, HCM is not entitled to an injunction because it cannot prove that it is being harmed, or is facing a real, imminent irreparable harm, from HLVP. HCM speculates that HLVP may, in the future, engage in certain bad behavior that could conceivably negatively affect HCM's reputation, but this type of speculation cannot support an injunction. The fact remains that, while HCM may find HLVP's use of the words "High Line" in its name irksome, HLVP's name is not harming HCM and should not be enjoined.

For all of these reasons, and those set forth below, the Court should find in favor of HLVP.

## II. FACTUAL BACKGROUND AND ANALYSIS

HCM seeks relief for alleged: (i) federal trademark infringement in violation of 15 U.S.C. § 1114; (ii) federal false designation of origin in violation of 15 U.S.C. § 1125; and (iii) trademark infringement and unfair competition in violation of New York State common law. *See* Defs.' Tr. Ex. D-2.[1]

To prevail on its federal trademark infringement claim, HCM must prove that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) *in connection with the sale ... or advertising of goods or services*, (5) without the plaintiff's consent." *1–800 Contacts, Inc. v. WhenU.Com, Inc.* 414 F.3d 400, 407 (2d Cir. 2005) (emphasis added). Additionally, HCM must prove HLVP's trade name "is likely to cause confusion ... as to the affiliation, connection, or association of [HLVP] with [HCM], or as to the origin, sponsorship, or approval of [HLVP's] goods, services, or commercial activities by [HCM]." *Id*. The same analysis applies to HCM's false designation of origin and state trademark infringement claims. *See Flushing Bank v. Green Dot Corp.*, 13 Civ. 9120 (KBF), 2015 WL 5802385, at *14 (S.D.N.Y., Oct. 5, 2015).

### A. HLVP DOES NOT PROVIDE ANY SERVICES

As a threshold matter, in order to prove its infringement claims, HCM must establish that HLVP used the "High Line Venture Partners" trade name in commerce in conjunction with the sale or advertising of services. 15 U.S.C. §§ 1114, 1125, 1127. It cannot.

---

[1] On November 12, 2015, HCM voluntarily dismissed its third, fourth (with respect to Illinois law), and fifth claims for relief, respectively. *See Dkt*. 77.

When determining whether an activity constitutes a "service," "[t]he controlling question is who *primarily* benefits from the activity […]." *City Nat'l Bank v. OPCI Mgmt. GP Inc./Gestion OPGI Inc.*, 106 U.S.P.Q. 2d 2042, 2013 WL 3168094, at *18 (T.T.A.B.,[2] April 26, 2013). "[I]f the activity primarily benefits applicant, it is not a registrable service even if others derive an incidental benefit." *See City Nat'l Bank*, 2013 WL 3168094, at *18; *see also Murphy v. Provident Mut. Life. Ins. Co. of Phila.*, 923 F.2d 923, 927 (2d Cir. 1990) (holding the term "services" "does not apply to services that are solely for the benefit of the performer; the services must be rendered to others.").

Here, HLVP is a venture capital firm that invests exclusively in private, technology start-up companies' highly-illiquid—and risky—equities. One-hundred percent of the capital HLVP uses to make investments comes from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants' Findings of Fact ("FOF") ¶¶ 15–16. In other words, HLVP's entire business activity consists of buying and selling investments *for its own benefit using its own funds*. *Id.* at ¶ 17. HLVP is not an institutional investor, does not have, or solicit, outside investors, and does not manage capital on behalf of third parties. *Id. at* ¶ 61; *Cf. Morningstar Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d 133, 138 (2d Cir. 1999) (an institutional investor who sought "out direct investment opportunities for [itself] *and others*," and managed third-parties' capital, offered services within the meaning of the Lanham Act) (emphasis supplied); *see also* U.S. Patent and Trademark Office Trademark Manual of Examining Procedure § 1301.01(b)(iv) (citing examples of soliciting and investing funds of others to be a registrable service whereas merely investing for oneself is not).

---

[2] Trademark Trial and Appeal Board decisions are "accorded great weight" by federal courts. *Murphy Door and Bed Co., Inc. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989).

Accordingly, HLVP does not provide any services or goods to the public and, thus, its venture capital investments fall outside of the Lanham Act's scope. Accordingly, Counts I and II fail. HCM's NY common law unfair competition claim fails for the same reason (*see infra*).

### B.   THERE IS NO LIKELIHOOD OF CONFUSION

Assuming *arguendo* that HLVP does provide services, Counts I and II still fail because, as HLVP will establish at trial, HLVP's trade name does not create a likelihood of consumer confusion.

As an initial matter, the difference between a trade name and a trademark "is that a trade name is usually adopted for the purpose of identifying the company and distinguishing it from other producers, rather than for the trademark purpose of identifying goods, and distinguishing them from those produced by other producers." *Havana Club Holding, S.A. v. Galleon S.A.*, 974 F.Supp. 302, 315 (S.D.N.Y. 1997). Whether a trade name infringes a trademark is determined by the same "likelihood of consumer confusion" test applicable to trademarks. *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 9:1 (4th ed. 2015).

"Likelihood of confusion means a probability of [consumer] confusion; it is not sufficient if confusion is merely 'possible.'" *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir. 1997). "A probability of confusion may be found when a <u>large number of purchasers </u>likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998) (emphasis added).

To determine whether there is a likelihood of confusion, courts consider "the familiar *Polaroid* factors, which include: 1) the strength of the plaintiff's mark; 2) the similarity of plaintiff's and defendant's marks; 3) the competitive proximity of the products; 4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; 5) actual confusion

between products; 6) good faith on the defendant's part; 7) the quality of defendant's product; and 8) the sophistication of buyers." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993) *referencing Polaroid Corp. v. Polaroid Elecs., Corp.*, 287 F.4d 492 (2d Cir. 1961).

For the reasons discussed *infra*, HCM has failed to prove HLVP's trade name is likely to cause consumer confusion with HCM's HIGHLINE marks-in-suit.

### 1. The HIGHLINE Marks-in-Suit are Weak

The first *Polaroid* factor is the strength of the trademark-at-issue. Under this factor, courts utilize a "two-prong test," whereby they: (i) classify the mark according to its conceptual strength, and then (ii) evaluate the mark's commercial strength. *See* MCCARTHY ON TRADEMARK AND UNFAIR COMPETITION, § 11:83 (4th ed. 2015); *see also Omicron Capital, LLC v. Omicron Capital, LLC*, 433 F.Supp. 2d 382, 390 (S.D.N.Y. 2006). However, commercial strength is more important than conceptual strength. *See Brockmeyer v. Hearst Corp.*, 248 F.Supp. 2d 281, 294-5 (S.D.N.Y. 2003) (holding "[t]he lack of commercial recognition of the plaintiff's mark demonstrates that the <<O>> mark is a weak mark", despite its inherent distinctiveness).

Here, HCM asserts (i) U.S. Trademark Reg. No. 2,502,179, for the word mark "HIGHLINE," and (ii) U.S. Trademark Reg. No. 3,676,129, for the following composite design and word mark:



(the HIGHLINE word mark and HIGHLINE composite mark will hereinafter be collectivelyreferred to as the "HIGHLINE Marks"). *See* Defs.' Tr. Ex. D-2.

The parties agree the HIGHLINE marks-in-suit are inherently distinctive. However, it does not follow that the marks-in-suit are therefore commercially strong. *See Oxford Indus., Inc. v. JBJ Fabrics, Inc.*, 1998 WL 9959, at *4 (S.D.N.Y., Feb. 2, 1998) ("[a] mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks significance in the market place for identifying the origin of goods.").

To establish that its marks are commercially strong, HCM must demonstrate "that the *primary* significance of the term ["Highline"] in the minds of the consuming public is [HCM] […]." *20th Century Wear, Inc.*, 815 F.2d at 10  (emphasis in original). To do so, HCM must proffer evidence of "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and[ ] (6) length and exclusivity of the mark's use." *New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 Civ. 6433 (NRB), 2012 WL 251976, at *4 (S.D.N.Y., Jan. 11, 2012).  HCM fails to carry this "heavy burden" for four reasons.

*First*, HCM admits that U.S. securities laws "heavily restrict" a hedge fund's its ability to promote its services.  FOF ¶ 89.  Even with the recent lifting of SEC restrictions, HCM has conducted no advertising.

*Second*, HCM, despite its financial wherewithal, did not conduct a consumer survey for this litigation "measuring the extent to which consumers associate its [HIGHLINE] marks with its [services]." *Chum Ltd. v. Lisowsk*, 198 F.Supp. 2d 530, 534 (S.D.N.Y. 2002).  This weighs against a finding of secondary meaning.  *See Id.* ("[T]he court finds it quite significant that Chum, a very large and financially able media corporation, did not muster any survey evidence demonstrating the requisite link in the minds of consumers between Chum's marks and its program.").  Indeed, the only survey HCM ever conducted regarding its brand—an April 2014

"perception survey"—indicated that HCM's Highline marks had extraordinarily weak brand recognition.  *See* Defs.' Tr. Ex. D-4; FOF ¶ 91.

*Third*, HCM does not receive a significant amount of media coverage, and the majority of the media coverage that actually exist concerns speaking engagements by HCM's principals, *not* its hedge fund management services.  FOF ¶ 45.

*Fourth*, HCM cannot viably claim exclusivity over the mark given that there are more than 1,000 unique references to entities and domain names using the term HIGHLINE or spelling variations thereof.  FOF ¶ 46.  Such extensive third-party use of "Highline" dilutes and effectively refutes any claim of alleged commercial strength of HCM's HIGHLINE marks.  *See Vista Food Exchange, Inc. v. Vistar Corp.*, No. 03-cv-5204DRHWDW, 2005 WL 2371958 (E.D.N.Y., Sept. 27, 2005) (Holding that plaintiff had a weak mark where "Defendant has produced evidence that there are 10 businesses in the Bronx and 67 businesses in Manhattan operating under or incorporating the name 'Vista.'  […] Plaintiff does not dispute Defendant's findings but merely asserts that the companies using the term 'Vista' in the Bronx and Manhattan are not in the food distribution business. Extensive third-party use of the term 'Vista,' however, still serves to weaken Plaintiff's mark despite the different nature of the other companies.").

In short, the evidence does not establish that the primary significance of the term "Highline" in the public's mind is HCM and its hedge fund management services.  Accordingly, the HIGHLINE marks-in-suit are weak, and the first *Polaroid* factor favors HLVP.  *See Omicron Capital, LLC*, 433 F.Supp. 2d at 390 ("Because of Plaintiff's failure to cultivate any association between itself and 'Omicron Capital,' it cannot demonstrate that its mark has acquired significant secondary meaning and, therefore, the first *Polaroid* factor tends to favor Defendant.").

### 2. The Marks Convey Different Commercial Impressions

The second *Polaroid* factor is the degree of similarity between the marks. This factor "looks to whether the similarity of the marks is likely to provoke confusion among prospective purchasers." *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F.Supp. 2d 304, 311 (S.D.N.Y. 2010). The "entire look of the marks, including logos, typefaces and package designs as they appear in the marketplace must […] be considered." *Citigroup Inc. v. City Holding Co.*, 171 F.Supp. 2d 333, 347-48 (S.D.N.Y. 2001).

The parties' respective logos are reproduced *infra*:



As an initial matter, to the extent HLVP promotes itself at all (*e.g.*, to companies in which it may invest), such promotion is limited to business cards and a website, which prominently display Ms. Fisher's name and contact information in conjunction with HLVP's distinctive logo. Further, as shown *supra*, even though the words "High Line" sound like "HIGHLINE", the parties' logos create distinctive and strikingly different commercial impressions. As such, no ordinary, prudent consumer of these types of services could reasonably believe that venture capital funding offered under HLVP's logo somehow originates from, is endorsed by, is affiliated or associated with, or is otherwise connected to HCM, and vice versa.

Based on the foregoing, the second *Polaroid* factor favors HLVP.

### 3. The Parties are Not Competitors

The third *Polaroid* factor is "competitive proximity" of the parties' respective services. This factor "'consider[s] whether the two products [or services] compete with each other.'" *New*

*Look Party Ltd.*, 2012 WL 251976, at *6 *quoting W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993).

Here, the parties exist for different reasons and do not compete against one another. *Compare Omicron Capital, LLC*, 433 F.Supp. 2d at 394 (holding no likelihood of confusion between the parties' identical "OMICRON" marks when used by plaintiff for hedge fund services and by defendant for commercial lending services) *with Morningside Grp. Ltd.*, 182 F.3d at 140 (finding a likelihood of confusion because, *inter alia*, both parties "provide[d] essential[ly] the same service to the same customer base […].").

HCM is a hedge fund that solicits outside investors who are seeking an investment objective of capital preservation. HCM then manages their investments through one or more of six separate private investment funds (the "Highline Funds"). Defs.' Tr. Ex. D-238, at ¶ 3. Pursuant to its "capital preservation" objective, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬ FOF ¶ 5.

By contrast, HLVP is not a hedge fund; it is a venture capital fund that does not have, or solicit, outside investors, and does not manage third-parties' capital. Rather, HLVP seeks lucrative long-term returns by investing its own money in highly illiquid and risky private start-up technology companies. These investments are typically held until the investee company has grown sufficiently to be sold privately to another company, to be acquired by its management, or to have an initial public offering, which events may not take place for a decade or more.

Given the different goals and strategies of these two parties, they simply do not compete with one another for investment dollars or investors and, thus, "are in no sense proximate

products." *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 449 (S.D.N.Y. 1982). Accordingly, the third *Polaroid* factor strongly favors HLVP.

### 4. HCM Is Not Likely to Bridge the Gap

The fourth *Polaroid* factor is "bridging the gap." This "factor addresses the question of whether the two companies are likely to compete directly in the same market." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F.Supp. 2d 207, 239-40 (S.D.N.Y. 2012).

HCM admittedly does not offer a venture capital fund, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. FOF ¶ 59. Any speculation by HCM as to future expansion into the venture space must be disregarded,[3] and the fourth *Polaroid* factor favors HLVP.

### 5. There is No Evidence of Actual Confusion During the Parties' Five-Year Co-Existence

The fifth *Polaroid* factor concerns evidence of actual confusion between the parties' respective marks or trade names. Actual confusion evidence takes the form of "mistaken orders, complaints from customers or website visitors, market surveys or other signs of uncertainty reflecting actual consumer confusion." *BigStar Entmt., Inc. v. Next Big Star, Inc.*, 105 F.Supp. 2d 185, 213 (S.D.N.Y. 2000).

Here, HCM concedes that it has no evidence of confusion in the form misdirected communications or complaints concerning HLVP. FOF ¶ 98. Nor did HCM conduct a consumer survey concerning actual confusion. While survey evidence is not required to prove actual confusion, "[t]he lack of survey evidence counts against finding actual confusion." *Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994). Taken together, HCM's failure to produce evidence of mistaken investments, customer complaints, and market

---

[3] *See Lebewohl v. Heart Attack Grill LLC*, 890 F.Supp. 2d 278, 295 (S.D.N.Y. 2012) ("A speculative intention is insufficient to demonstrate that bridging the gap is likely; a litigant should provide evidence of a concrete expansion plan.").

surveys establishes there has been no actual consumer confusion.  *See Omicron Capital, LLC*, 433 F.Supp. 2d at 392-93.

HCM attempts to fill the void left by the lack of any actual consumer confusion and the absence of a survey by proffering three anecdotal instances of alleged confusion in the media or on social media.  Specifically, HCM claims that references to HLVP as "Highline Capital" in two different press articles, and a Twitter post, constitute relevant instances of actual confusion. However, these three isolated instances do not establish confusion among *consumers* making *purchasing* decisions—the relevant type of consumer the Lanham Act seeks to protect.

*First*, alleged confusion among journalists and social media users is "the wrong type of confusion for purposes of the Lanham Act because 'trade-mark infringement protects only against mistaken purchasing decisions and not against confusion generally.'" *Medici Classics Prods., LLC*, 683 F.Supp. 2d at 311 (rejecting as evidence of actual confusion *Gramaphone* magazine's mistaken publication that defendants' recordings were released on plaintiffs' label).

*Second*, HCM does not have any evidence that the authors of these statements actually confused (or had even heard of) the parties, as opposed to simply making a scrivener's error or mistake.  The tweet-at-issue was posted by Mr. Jason Shen.  Mr. Shen could not have confused the parties because he testified unequivocally that he had never heard of either party before posting his Tweet.  FOF ¶¶ 126–128.  Moreover, when asked why he identified Ms. Fisher as being associated with Highline Capital, Mr. Shen replied: "I'd never met her.  I'd never heard of her […] Just an error […] When you're live tweeting you don't have a lot of time.  You're trying to like – you know, they're already talking about the next thing.  So I just wrote 'Capital' by accident."  *Id*. at ¶ 126.

One of the two articles-at-issue was posted on the website, *Technically Brooklyn*. The *Technically Brooklyn* article linked to an underlying *Crain's New York* article. The *Crain's* article appears to have been a typographical transposition of the names of two companies, *i.e.*, "High Line Ventures" and "FirstMark Capital" such that it came out "High Line Capital and FirstMark Ventures. That typographical error was later corrected by *Crain's*. *Id*. at ¶ 123. HCM did not depose the author of the other article-at-issue (which appeared on *Business Insider*'s website), or the *Technically Brooklyn* author. Thus, there is no record evidence concerning either journalist's respective state of mind, let alone evidence to support the proposition that they confused HLVP with HCM, or vice versa. *Id*. at ¶ 124.

*Finally*, even assuming any of the three authors were confused (but see *supra*), three instances of consumer confusion would be *de minimis* and insufficient to prove cognizable confusion because "the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an <u>appreciable number</u> of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978). (emphasis added); *accord Deniamafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112(AJP), 2014 WL 814532, at *12 (S.D.N.Y., Mar. 3, 2014).

In short, the parties have co-existed for five years without a single mistaken investment, consumer complaint, or other indicia of actual consumer confusion. Such peaceful co-existence is proof that actual confusion has not occurred, and that confusion is not likely to occur. *See Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 228 (2d Cir.1999) ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion,

that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion") *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418 (2003). Accordingly, the fifth *Polaroid* factor favors HLVP.

### 6. Defendants Adopted Their Mark in Good Faith

The sixth *Polaroid* factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Medici Classics Prods., LLC*, 683 F.Supp. 2d at 312. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Indeed, since HLVP does not use the name as a "trademark," but only as a company name, ███████████████████████████████████████████████████████████████.

Moreover, the evidence will clearly establish that HLVP adopted its trade name in good faith. First, HLVP's founder and Managing Partner, Ms. Shana Fisher, adopted the trade name "High Line Venture Partners" in 2010 to reference HLVP's geographic location near Manhattan's popular High Line Park. FOF ¶ 85. As HCM must concede, adopting a trade name in reference to a geographic location is commonplace. *Id.* Indeed, not only did HCM adopt its name after a geographic location, but scores of third-party "Highline" entities have as well, including in reference to Manhattan's High Line Park—just like HLVP.

Second—and most importantly—the evidence establishes that the first time HLVP's principals heard about HCM and its mark was approximately four years *later* in 2014, when HCM's CFO, Mr. Singer, contacted Ms. Fisher. FOF ¶ 114. Accordingly, HLVP adopted its trade name in good faith and, thus, the sixth *Polaroid* factor favors HLVP.

15

### 7. HLVP's Sterling Reputation Does Not Jeopardize HCM's Reputation

The seventh *Polaroid* factor is "'primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality.'" *Kind LLC v. Clif Bar & Co.*, No. 14 Civ. 770(KMW)(RLE), 2014 WL 2619817, at *11 (S.D.N.Y., June 12, 2014).

HCM readily admitted when commencing this action that it was "not aware of any quality deficiencies in Defendants' services [...]." Defs.' Tr. Ex. D-236, at 21. This is, of course, hardly surprising considering that HLVP's Ms. Fisher has been heralded as a venture capital "hero." FOF ¶ 11. Since that time, HCM has further admitted that: (i) it has "not heard anything negative about [HLVP]" (FOF ¶ 137); (ii) no consumers have complained to HCM about HLVP or its venture fund (FOF ¶ 134); and (iii) HCM has not lost any prospective investors, existing investors, or investment opportunities to (or because of) HLVP. FOF ¶ 135. As there is no evidence in the record to suggest HCM's reputation has been, or will be, harmed by HLVP, the seventh *Polaroid* factor favors HLVP.

### 8. Investors in HCM's Highline Funds Are Extremely Sophisticated

The eighth *Polaroid* factor concerns the sophistication of the relevant purchasers. "The eighth and final *Polaroid* factor acknowledges that 'the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product.'" *Omicron Capital, LLC*, 433 F.Supp. 2d at 393 (S.D.N.Y. 2006).

As discussed *supra*, HLVP does not have investors. HCM, on the other hand, admittedly has sophisticated investors who engage in extensive due diligence and research before investing the requisite substantial sums in HCM's Highline Funds. FOF ¶ 92. Such investor

16

sophistication militates against a likelihood of confusion.  *See Omicron Capital, LLC*, 433 F.Supp. 2d at 394 ("Plaintiff's 'smart' and 'savvy' investors perform research and due diligence before investing their money with Plaintiff's fund, going so far as to investigate Plaintiff's principals […]  Given their sophistication, the consumers of Plaintiff's and Defendant's services are unlikely to be confused based upon Defendant's use of "Omicron Capital.'").

Based on the foregoing, the eighth *Polaroid* factor favors HLVP.

### 9. The Balance of *Polaroid* Factors

On balance, the *Polaroid* factors overwhelmingly favor HLVP and militate against a finding of a likelihood of confusion.   Based on the foregoing, the Court should find for HLVP on Counts I and II of the Complaint.

### C. HCM CANNOT PREVAIL ON ITS COMMON LAW CLAIM

In Count IV of the Complaint, HCM seeks relief for trademark infringement and unfair competition under New York State common law. "The elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims."  *Kaplan, Inc. v. Yun*, 16 F.Supp. 3d 341, 351 (S.D.N.Y. 2014). "A plaintiff claiming unfair competition under New York law must [also] show that the defendant acted in bad faith."  *Empresa Cubano del Tabaco v. Culbro Corp.*, 399 F.3d 462, 485 (2d Cir. 2003).

Here, as discussed *supra*, the evidence establishes that: (i) HLVP's trade name does not create a likelihood of consumer confusion with HCM, its marks-in-suit, or its hedge fund management services, and (ii) not only is there a complete absence of evidence supporting a claim of bad faith, the evidence shows that HLVP adopted and uses its trade name in good faith. Accordingly, Count IV fails.

### D.     HCM IS NOT ENTITLED TO PERMANENT INJUNCTIVE RELIEF

HCM waived its right to monetary relief in this action. Thus, the only issue is whether HCM is entitled to the equitable relief it seeks: an injunction permanently enjoining HLVP's use of its trade name. It is not.

The Supreme Court has explained that a party seeking a permanent injunction cannot rely on a presumption of irreparable harm; it must <u>affirmatively show</u> that "it has suffered an irreparable injury" that cannot be remedied by monetary damages. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 394 (2006); *see also New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 Civ. 6433 (NRB), 2012 WL 251976, at *2 (S.D.N.Y., Jan. 11, 2012) ("Despite long-held circuit precedent, [irreparable] harm [is] no longer presumed in copyright or trademark cases."). To make this showing, HCM must proffer evidence demonstrating that, in the absence of a permanent injunction, the harm it will allegedly suffer is "real, actual, and imminent, not remote or speculative." *NYP Holdings v. N.Y. Post Publ. Inc.*, 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014).

Here, HCM *alleges* that it will suffer irreparable, "reputational" harm unless an injunction is entered against HLVP's use of its trade name. However, as discussed *supra*, HCM is admittedly unaware of any quality deficiencies in HLVP's venture capital investments. Furthermore, HCM's reputational harm "evidence" is purely hypothetical. Indeed, HCM simply theorizes that its reputation would be harmed <u>if, *e.g.*,</u> HLVP in the future committed a series of sensational financial crimes. Such speculation is insufficient as a matter of law to establish the real, actual, and imminent harm that HCM must demonstrate in order for an injunction to issue. *See, e.g., Grand River v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007. Accordingly, HCM is not entitled to a permanent injunction.

### III. CONCLUSION

Based on the foregoing, the Court should find for HLVP on Counts I, II, and IV of the Complaint, and HCM's request for a permanent injunction should be denied.

Dated: November 16, 2015
New York, New York

Respectfully submitted,

*/s/Jonathan W. Thomas*
Jonathan D. Reichman
Jonathan W. Thomas
Kenyon & Kenyon LLP
One Broadway
New York, New York 10004
Tel.: (212) 425-7200
Fax: (212) 425-5288
Email: jreichman@kenyon.com
Email: jthomas@kenyon.com


Edward T. Colbert (*pro hac vice*)
Erik Kane (*pro hac vice*)
Kenyon & Kenyon LLP
1500 K Street, NW
Washington, DC 20005
Tel.: (202) 220-4200
Fax: (202) 220-4201
Email: ecolbert@kenyon.com
Email: ekane@kenyon.com

*Attorneys for all Defendants*

## **CERTIFICATE OF SERVICE**

      It is hereby certified that, on November 16, 2015, a true and correct copy of the foregoing document, entitled **Defendants' Pre-Trial Statement**, was served via operation of the Court's ECF filing system, and that notice of such filing will be electronically transmitted to all parties indicated on the electronic filing receipt.

                        */s/Jonathan W. Thomas*
                        Jonathan W. Thomas