**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HIGHLINE CAPITAL MANAGEMENT, LLC,

    *Plaintiff*,

- against -

HIGH LINE VENTURE PARTNERS, L.P.,

    *Defendants*.

Civil Action No. 15-cv- 660 (VEC)

**MOTION IN *LIMINE* #1**

**(REPUTATIONAL HARM)**

KENYON & KENYON LLP
Counsel for Defendants

One Broadway
New York, New York 10004
Tel.: (212) 425 – 7200
Fax: (212) 425 – 5288

Pursuant to Federal Rules of Evidence 402 and 403, Defendants High Line Venture Partners, L.P., High Line Venture Partners II, L.P., High Line Venture Partners GP, LLC, High Line Venture Partners GP II, LLC, and Shana Fisher (collectively, "HLVP"), move for an order limiting Plaintiff, Highline Capital Management, LLC ("HCM"), from offering speculative evidence in support of its claim that it could theoretically suffer reputational harm from HLVP's use of the HIGH LINE trade name for a venture capital fund.  The evidence on which HCM proposes to rely is not only highly speculative, but also legally irrelevant.  It would therefore be improper to allow HCM to rely on such evidence in this case.

Specifically, HCM has identified several witnesses in pretrial disclosures that will testify as to reputational harm.  HCM seeks to introduce a number of exhibits and fact and expert testimony concerning the *potential* for reputational harm.  For example, HCM includes on its trial exhibit list several articles discussing the Bernie Madoff scandal and implications it had for third parties.  *See e.g.,* Pl.'s Tr. Ex. D-273 (*Merkin Fund Must Change Name to Avoid Madoff Link, Rival Says*, BLOOMBERG, January 7, 2009); Pl.'s Tr. Ex. D-274 (*What's in a Name? A Lot, to a Fund Not Tied to Madoff*, N.Y. TIMES, January 14, 2009).  In addition, HCM's exhibit list consists of numerous articles concerning HLVP's various investments.  *See e.g.,* Pl.'s Tr. Exs. D-40; D-45 (articles discussing HLVP's investment in Aereo and Aereo's bankruptcy filing).  Several of HCM's fact witnesses and expert witnesses have suggested in deposition testimony and expert reports that there is the *potential* for reputational harm based on association with a scandal or with certain bad investments, although no one has identified any specific current reputational harm allegedly cause by HLVP.  HCM should be precluded from introducing such speculative evidence of reputational harm that has no basis in fact.

**ARGUMENT**

A district court has the inherent power to grant a motion *in limine* to exclude evidence as irrelevant or unduly prejudicial. *See Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). The purpose of *in limine* motion practice is to enable the court to "rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted).

The Federal Rules provide that evidence is admissible only if it has a tendency to make a fact of consequence more (or less) probable. *See* Fed. R. Evid. 401, 402. The trial court, though, retains broad discretion to exclude even relevant evidence. *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1193 (2d Cir.1989) (citing Fed. R. Evid. 403). Most notably, the Rules permit a court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; *see also United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (evidence is prejudicial if it "involves some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence"); Fed. R. Evid. 403 advisory committee's note ("'Unfair prejudice' … means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.").

In the present case, HCM is seeking an injunction to force HLVP to change its name. Injunctions require proof of irreparable harm. Having conceded that it has suffered no financial harm whatsoever from HLVP's actions (and having dropped its damages claims entirely), HCM is left to support its claim of irreparable harm on a theory of future reputational harm.

The evidence on which HCM proposes to rely on to the *possibility* of "reputational harm" is both irrelevant and unfairly prejudicial. Rather than present the Court with facts relating to the likelihood of real and actual harm, HCM's witnesses propose to engage in sheer speculation, thus making their testimony irrelevant. *Cf.* Fed. R. Evid. 401. Further, HCM improperly hopes to appeal to emotion by offering evidence of past, notorious financial frauds committed by third parties utterly unrelated to HLVP, even though such evidence has no applicability to this case or this Court's decision-making process.

**A.     The Evidence on Which HCM Proposes to Rely is Speculative**

HCM has stated that several of its witnesses, both fact and expert, will testify about the "reputational harm" HCM may suffer in the future due to HLVP's use of the trade name HIGH LINE for its venture capital fund. *See* Declaration of Erik C. Kane ("Kane Decl.") Ex. A (email from HCM counsel Megan Bannigan disclosing witnesses). The basis for the proposed testimony on that subject, however, is wholly speculative.

The speculative nature of HCM's reputational harm claim can be seen from the deposition testimony of several of its witnesses, all of whom were testifying on behalf of HCM pursuant to Federal Rule 30(b)(6). Each witness testified that he had uncovered no basis for concluding that HCM has suffered *any* actual harm (reputational or otherwise) to date, or even that the prospect for such harm was *likely* as a result of HLVP's current activities. Thus, any claim of "harm" by HCM at trial would be sheer guesswork:

**Deposition of Jacob Doft [30(b)(6) Witness]**

Q.     To your knowledge, has Highline been harmed by High Line Venture Partners using the name High Line?

3

A. There's just simply no way for me to know.[1]

Q. To your knowledge, has Highline suffered any diminution in its revenues due to High Line Venture Partners?

A. Again, there's no way for me to know.

Q. Has Highline conducted any analysis of its revenues to determine if it's suffered a diminution in sales by High Line Venture Partners?

A. There would be no way for us to measure sales from customers who don't call us and don't even speak to us as a result of the confusion, so there's no way for us to know.

* * *

Q. To your knowledge, has the company lost any customers because of High Line Venture Partners?

A. There would be no way for us to know.

**Deposition of Howard Singer [30(b)(6) Witness]**

Q. [S]ince you first learned about [Defendants] … approximately one year ago, … have you lost any customers because of [them]?

A. There's absolutely no way for me to speculate on that because there's a huge universe of potential investors and I have no idea how they react to your client being associated with our firm.

**Deposition of Michael Klarman [30(b)(6) Witness]**

Q. To the best of your knowledge, as the CFO, was Highline Capital Management harmed by High Line Venture Partners offering its venture capital firm under the Highline name?

* * *

A. [T]that would be impossible for me to know or not.

Q. Well, to your knowledge, did Highline suffer any diminution in its revenues due to High Line Venture Partners?

---

[1] In fact, there are various ways that HCM could have attempted to determine whether its reputation was actually being harmed, *e.g.*, through survey evidence, or by contacting customers and potential customers. HCM chose not to undertake any of these activities, and affirmatively prevented any questioning of its customers by HLVP throughout the litigation, so as not to bother them. Having chosen this course of action, it is all the more egregious that HCM intends to argue at trial that its reputation might theoretically be harmed, should HLVP in the future commit financial atrocities, à la Bernie Madoff.

4

> A. Again, I don't know.
>
> Q. Have you attempted to conduct any calculations to determine if there was a diminution in revenues due to High Line Venture Partners?
>
> A. Specific calculations related to that, no.
>
> Q. To your knowledge, did Highline suffer a loss of any investors as a result of High Line Venture Partners?
>
> A. I don't know.
>
> Q. To the best of your knowledge, did any existing investors choose to liquidate their accounts based on High Line Venture Partners?
>
> A. I don't know.
>
> Q. To your knowledge, did any investors cancel any of their accounts based on High Line Venture Partners?
>
> A. I don't know.
>
> Q. To the best of your knowledge, do you know of any way in which Highline Capital Management has been harmed by High Line Venture Partners?
>
>       \*   \*   \*
>
> A. I don't know.

Doft Dep. 186:18–187:10, 187:20-23; Singer Dep. 68:24–69:9; Klarman Dep. 160:22–162:16; Kane Decl. Exs. B–D (deposition excerpts); *see also* Doft Dep. 147:18–148:7 (stating that HCM has not conducted any brand recognition studies).

Moreover, HCM has admitted that "it is not aware of any quality deficiencies in Defendants' services . . . ." Defs.' Tr. Ex. D-236, at 21. In short, there is no evidence that HLVP actually has a poor reputation.[2]

Instead of pointing to any actual harm, it appears that HCM intends to rely on expert testimony to pursue what can only be described as a speculative "contingent theory" of reputational harm. That is to say, HCM's experts (like HCM's fact witnesses)

---

[2] Indeed, the evidence at trial will show the contrary.

do not claim that HCM *is suffering* reputation harm, or even that such harm is likely. Rather, they simply assert that in the event confusion arises from HCM's use of its asserted marks and HLVP's use of its trade name, such confusion "*may*" negatively affect HCM's reputation, particularly if HLVP commits some type of morally or ethically reprehensible act in the future. *See* Expert Report of David Stowell ("Stowell Report") at ¶¶ 28-29 (merely claiming that consumer confusion "*may* cause [HCM] to lose potential investors" and speculating that if confusion arises "High Line's reputation *could possibly* be attributed to Highline, undermining Highline's own unique brand") (emphasis added to both); Expert Report of Ronald Wilcox ("Wilcox Report") at ¶¶ 12, 28, 31 (claiming only that confusion could create "an uncontrollable risk" that Plaintiff's reputation would be harmed). Kane Decl. Exs. E–F (expert report excerpts).

For example, both of HCM's experts point to the sensational and well-publicized Bernie Madoff scandal, which was the largest financial fraud (a Ponzi scheme that bilked investors out of more than $18 billion) ever perpetrated in U.S. history. Specifically, both experts refer to companies (*e.g.*, Ariel Investments) that the public allegedly mistakenly associated with funds operated by the Madoff firm (Ariel Fund) and claim that those entities suffered some reputational harm as a result of the false association. *See* Stowell Report at ¶ 31; Wilcox Report at ¶ 29; Kane Decl. Exs. E–F. Tellingly, though, neither expert suggests that those companies would have suffered harm from use of a similar name, if Bernie Madoff *had not* committed eleven felonies and defrauded thousands of investors of billions of dollar. *See generally id.* Rather, the alleged harm only befell them because of the magnitude of the Madoff crimes and the concomitant wall-to-wall national publicity. Such a unique combination of events, however, can hardly serve as a model for whether *HLVP's* use of the trade name HIGH LINE for its

6

venture capital fund in the ordinary course of business is *likely* to harm HCM's reputation among relevant consumers (that is to say, prospective investors in HCM's fund), even assuming confusion is likely.[3]

## B. HCM May Not Use Speculative Evidence to Prove Irreparable Harm

The Supreme Court has explained that a party seeking a permanent injunction cannot rely on a presumption of irreparable harm; it must <u>affirmatively show</u> that "it has suffered an irreparable injury" that cannot be remedied by monetary damages. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 394 (2006); *see also Ascentive, LLC v. Opinion Corp.*, 842 F.Supp. 2d 450, 459 (E.D.N.Y. 2011) (the presumption of harm previously applied in trademark cases upon a showing of confusion "is no longer applicable") (citing *Salinger v. Colting*, 607 F.3d 68, 79−80 (2d Cir. 2010)). In addition, the Second Circuit has instructed that "claims of irreparable harm sufficient to support injunctive relief must be real, actual, and imminent, not remote or speculative." *NYP Holdings v. N.Y. Post Publ. Inc.*, 63 F.Supp. 3d 328, 341 (S.D.N.Y. 2014) (citing *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)); *see also Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 35 (2d Cir. 1995) ("irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial").

HCM therefore bears the burden of proving at trial that it will suffer a "real, actual, and imminent" harm if there is consumer confusion. *See Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007); *NYP Holdings*, 63 F. Supp. 3d at 341. As detailed above, however, HCM cannot point to any real or actual harm (reputational or others), nor does it suggest that harm is "imminent" based on HLVP's

---

[3] There is no evidence that Ariel Investments claimed that they were being harmed by the Ariel Fund *before* news of the Madoff crimes broke which suggests that their sophisticated hedge fund clients were not confused by the two names.

7

current activities. Instead, HCM engages in pure speculation, theorizing that HCM's reputation would be harmed *if* HLVP in the future commits a series of sensational financial crimes. *See supra*. Such "proof," though, is insufficient as a matter of law to establish the required showing of irreparable harm. *See, e.g., Grand River*, 481 F.3d at 66. Indeed, under HCM's theory, an injunction would issue in every trademark case as there is always the chance—no matter how remote—that a defendant will at some point in the future engage in some type of reprehensible activity. The Federal Rules require more. Accordingly, as any evidence HCM might offer in support of that speculative theory is both legally irrelevant and highly prejudicial it should be excluded.

Respectfully submitted,

Dated:  November 16, 2015                KENYON & KENYON LLP


*/s/ Jonathan W. Thomas*
Jonathan D. Reichman
Jonathan W. Thomas
KENYON & KENYON LLP
One Broadway
New York, New York 10004
Tel.: (212) 425-7200
Fax: (212) 425-5288
Email: jreichman@kenyon.com
Email: jthomas@kenyon.com

Edward T. Colbert (admitted *pro hac vice*)
Erik C. Kane (admitted *pro hac vice*)
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
Tel.: (202) 220-4200
Fax: (202) 220-4201
Email: ecolbert@kenyon.com
Email: ekane@kenyon.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that, on November 16, 2015 a true and correct copy of the foregoing document, entitled MOTION IN *LIMINE* #1, was served via electronic mail, upon the following counsel of record for Plaintiff:

Lewis Donald Prutzman, Jr.
TANNENBAUM, HELPERN, SYRACUSE & HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10002
Prutzman@thshlaw.com

David Sandler
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10002
dsandler@debevoise.com

*/s/ Jonathan W. Thomas*
Jonathan W. Thomas

*Attorney for Defendants*