UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

| | |
|---|---|
| HIGHLINE CAPITAL MANAGEMENT, LLC, | : |
| Plaintiff, | :    15 CIV 660 (VEC) |
| | :    ECF Case |
| vs. | : |
| | : |
| HIGH LINE VENTURE PARTNERS, L.P., | : |
| HIGH LINE VENTURE PARTNERS II, L.P | : |
| HIGH LINE VENTURE PARTNERS GP, LLC | : |
| HIGH LINE VENTURE PARTNERS GP II, LLC | : |
| SHANA FISHER, | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# PLAINTIFF'S TRIAL MEMORANDUM OF LAW

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ................................................................................................................................... 3

   I.    Highline ....................................................................................................................... 3

   II.   High Line .................................................................................................................... 5

   III.  The Dispute ................................................................................................................ 7

Argument ............................................................................................................................... 8

   I.    High Line has infringed Highline's trademarks........................................................ 8

     A.   Highline's Trademarks are Valid. ........................................................................ 8

     B.   There is a Likelihood of Confusion between HIGHLINE and HIGH LINE. ...... 9

        1.   The HIGHLINE Marks Are Strong ............................................................ 11

        2.   Highline and High Line Are Virtually Identical. ........................................ 13

        3.   Highline's and High Line's Services Are Proximate.................................. 15

        4.   Potential Investors Will Conclude That Highline Has Bridged Any Gap. ... 18

        5.   Actual Confusion Already Exists................................................................. 19

        6.   High Line's Lack of Good Faith ................................................................. 22

        7.   The Quality of High Line's Services May Increase the Damage That Results From Confusion. ........................................................................................ 23

        8.   Even Sophisticated Consumers Will Be Confused .................................... 23

        9.   Balancing of the Polaroid Factors Weighs Heavily Against High Line. ... 25

     C.   High Line is Liable for Trademark Infringement and Unfair Competition Under New York Common Law. ..................................................................................... 25

     D.   Highline is Entitled to a Permanent Injunction. ................................................ 26

   Conclusion ................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*,
    793 F.3d 313 (3d Cir. 2015)......................................................................................27

*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*,
    No. 15 CV 1092 JMF, 2015 WL 845711 (S.D.N.Y. Feb. 26, 2015).....................................27

*Cadbury Beverages, Inc. v. Cott Corp.*,
    73 F.3d 474 (2d Cir. 1996)......................................................................................18

*Clinique Labs., Inc. v. Dep Corp.*,
    945 F. Supp. 547 (S.D.N.Y. 1996) ...........................................................................13

*Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.*,
    509 F. Supp. 1036 (S.D.N.Y. 1981)..........................................................................20

*Cullman Ventures, Inc. v. Columbian Art Works, Inc.*,
    717 F. Supp. 96 (S.D.N.Y. 1989) .........................................................................8, 13

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979)......................................................................................9

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*,
    440 F. Supp. 2d 249 (S.D.N.Y. 2006)........................................................................13

*Dreyfus Fund, Inc. v. Royal Bank of Canada*,
    525 F. Supp. 1108 (S.D.N.Y. 1981)......................................................................10, 19

*Estee Lauder Inc. v. Gap, Inc.*,
    108 F.3d 1503 (2d Cir. 1997)...................................................................................11

*Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*,
    No. 13 CV 0059 MGC, 2015 WL 1849834 (S.D.N.Y. Apr. 22, 2015) ................................ 22

*Gucci Am., Inc. v. Guess?, Inc.*,
    868 F.Supp.2d 207 (S.D.N.Y. 2012)..........................................................................19

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir. 1996)......................................................................................18

*Jahr USA Publ'g v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993)...................................................................................13

*K2 Advisors, LLC v. K2 Volatility Fund, LP*,
    No. 02 CIV. 3984 (AGS), 2002 WL 31235701 (S.D.N.Y. Oct. 4, 2002)....................... *passim*

*Kate Spade LLC v. Saturdays Surf LLC*,
   950 F. Supp. 2d 639 (S.D.N.Y. 2013)................................................................9

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
   15 F. Supp. 2d 389 (S.D.N.Y. 1998), *aff'd*, 192 F.3d 337 (2d Cir. 1999) ........12, 15

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*,
   192 F.3d 337 (2d Cir.1999)........................................................................8

*Lang v. Retirement Living Publ'g Co.*,
   949 F.2d 576 (2d Cir.1991)........................................................................12

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
   10 F. Supp. 2d 271 (S.D.N.Y. 1998)........................................................ *passim*

*McGregor-Doniger Inc. v. Drizzle Inc.*,
   599 F.2d 1126 (2d Cir. 1979)......................................................................9

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir. 1987)....................................................10, 16, 19, 23

*Morningside Grp., Ltd. v. Morningside Capital Grp., L.L.C.*
   182 F.3d 133 (2d Cir.1999)................................................................ *passim*

*N.Y.C. Triathlon, LLC v. N.Y.C. Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010)..........................................14, 15, 26

*Nike, Inc. v. Top Brand Co.*,
   No. 00 Civ. 8179 KMW RLE, 2005 WL 1654859 (S.D.N.Y. July 13, 2005)........................25

*Plus Prods. v. Plus Disc. Foods, Inc.*,
   722 F.2d 999 (2d Cir. 1983)......................................................................11

*Polaroid Corp. v. Polarad Elecs. Corp.*,
   287 F.2d 492, 495 (2d Cir. 1961)........................................................... 10-11

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010), *aff'd*, 511 F. App'x 81 (2d Cir. 2013)........................25

*Scarves by Vera, Inc. v. Todo Imps. Ltd.*,
   544 F.2d 1167 (2d Cir. 1976)................................................................12, 15

*Standard & Poor's Corp. v. Commodity Exch., Inc.*,
   683 F.2d 704 (2d Cir. 1982)......................................................................25

*Star Indus., Inc. v. Bacardi & Co.*,
   412 F.3d 373 (2d Cir. 2005)......................................................................18

*THOIP v. Walt Disney Co.*,
  736 F. Supp. 2d 689 (S.D.N.Y. 2010)................................................................18

*Tri-Star Pictures, Inc. v. Unger*,
  14 F. Supp. 2d 339 (S.D.N.Y. 1998)................................................................20

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,
  220 F. Supp. 2d 289 (S.D.N.Y. 2002)..............................................................25

*Ty, Inc. v. Jones Grp., Inc.*,
  237 F.3d 891 (7th Cir. 2001) ..........................................................................14

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*
  800 F. Supp. 2d 515 (S.D.N.Y. 2011)....................................................25, 26, 27

*United States v. Hon*,
  904 F.2d 803 (2d Cir. 1990)........................................................................9, 21

*Victorinox AG v. B & F Sys., Inc.*,
  No. 13 CIV. 4534 JSR, 2015 WL 5440670 (S.D.N.Y. Sept. 8, 2015) ...................27

*Virgin Enters. v. Nawab*,
  335 F.3d 141 (2d Cir. 2003)...........................................................................13

## STATUTES

Lanham Act § 7, 15 U.S.C. § 1057(b) .................................................................8

Lanham Act § 22, 15 U.S.C. § 1072 ................................................................2, 5

Lanham Act § 32, 15 U.S.C. § 1114 ...................................................................8

Lanham Act § 33, 15 U.S.C. § 1115.............................................................2, 5, 8

Lanham Act § 43, 15 U.S.C. § 1125 ...................................................................8

## OTHER AUTHORITIES

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:44 ...........................14

Plaintiff Highline Capital Management, LLC ("Highline") submits this trial memorandum in connection with the upcoming trial of this case against Defendants High Line Venture Partners, L.P., High Line Venture Partners II, L.P., High Line Venture Partners GP, LLC and High Line Venture Partners GP II, LLC and Shana Fisher (collectively, "High Line").

## PRELIMINARY STATEMENT

This is a trademark infringement case. The dispute is simple: Highline and High Line are both investment fund managers. Both are based in New York City. Both manage "alternative investment" funds. Both invest millions of dollars in venture investments. Both regularly receive publicity about their investment activities. And both refer to themselves, and are referred to by third parties, as "Highline" and "High Line," respectively, although even that slight difference vanishes when, as often occurs, they are referred to orally rather than in writing.

High Line's use of "High Line" in the alternative investments sector of the financial services industry is likely to confuse consumers by leading them to believe that High Line or its investments are affiliated with or otherwise associated with Highline. The media has already confused the two, including reporting that Highline has made speculative, high-risk investments that in fact were made by High Line. Because Highline has, for two decades, built a reputation for making cautious investment decisions based on thorough research, that confusion is likely to damage Highline's reputation and goodwill. Moreover, High Line's misappropriation of the "High Line" name in connection with a venture capital fund effectively forecloses Highline from making the natural extension of offering its own venture capital fund under the name "Highline."

Highline will show at trial that it has had trademark rights in the HIGHLINE name since 1995 – fifteen years before High Line's adoption of its "High Line Venture Partners" name in 2010. Highline registered its HIGHLINE mark with the U.S. Patent and Trademark Office ("USPTO") in 2001 – nine years before High Line's arrival on the scene, which, as a matter of

law, gave Highline the *exclusive* right to use the HIGHLINE mark in connection with investment fund management.  15 U.S.C. § 1115.  At the time that High Line selected the "High Line" name, it was not only thus on constructive notice of that trademark registration, 15 U.S.C. § 1072, but the evidence will show that it also had actual notice that "Highline Capital" was taken.  High Line nevertheless proceeded with the "High Line" name, without ever checking the USPTO trademark registration records or asking its counsel to clear the use of that name.

High Line has sought to evade the certain liability that results from using a nearly identical mark for an essentially identical service by raising several technical defenses, none of which are well taken.  It tried to petition to cancel Highline's registration on the basis that Highline is not using that mark; this Court has already rejected that claim and dismissed High Line's counterclaims.  It asserts that it is not actually using "High Line" as a trademark because it does not provide any services; that argument is both factually wrong (as High Line does provide services under that mark) and legally irrelevant (since trade name use by a defendant can give rise to liability for infringement of the plaintiff's trademark).  It argues that hedge fund and venture capital investment services are different, but those types of investments are both are in the same category of "alternative investments" and both appeal to the same class of investors and compete for the same investor dollars.  Moreover, hedge fund managers not only include private equity and venture investments in their funds, but also are increasingly offering standalone venture funds under their names.  Next, High Line tries to avoid liability by citing the sophistication of some investors, but the evidence will prove what common sense already suggests:  financial sophistication is not the same as typographic punctiliousness.  Even sophisticated investors can be confused by the use of virtually identical names.  And, finally, it cites the fact that other entities are using a version of the Highline mark, but virtually all of those

uses are either in different fields or have already changed their names in response to challenges by Highline.

Highline has spent over twenty years carefully curating its reputation for investment management services, which is the cornerstone of keeping and attracting new investors and is essential to its business. With respect to its HIGHLINE trademark, it has done all the right things to put the public on notice of its trademark rights and to protect its rights against infringers. High Line, in contrast, did none of the right things – it adopted the High Line mark recklessly, without undertaking any trademark search, without asking its lawyers to clear the trademark, and despite having express knowledge that "Highline Capital" already used the HIGHLINE name. Its adoption of that mark, and its more recent effort to gain more publicity for its "HIGH LINE" including through media reports and speaking roles at industry conferences, is already causing confusion, and that confusion will only get worse as the parties expand their services. As a matter of law and equity, High Line should be permanently enjoined from further use of the High Line name.

## FACTS

The following facts will be proved at trial:

### I.     Highline

Highline is a New York-based investment management firm founded in 1995 by Jacob Doft. Through substantial effort, Highline has grown over the last twenty years from a small fund manager to a well-recognized and respected investment firm with approximately $2.7 billion in assets under management, over thirty staff, and several investment funds (commonly referred to as hedge funds) under its Highline brand: Highline Capital Partners, L.P., Highline Capital Partners QP, LP, Highline Capital International, Ltd., Highline Select, L.P., Highline Enhanced, Ltd., Highline Enhanced, L.P., and Highline Capital Qualified Fund, Ltd.

Highline's strategy focuses primarily on long and short investments in publicly-traded equities, but also includes private equity investments, some of which have been in startups.[1] Both its investment strategy and brand are built upon thorough research through which it seeks to gain deeper market insights than other investors, allowing its funds to outperform the market, while also hedging its investments to reduce risk and volatility.  Highline's strategy has achieved marked success:  during the past two decades, Highline's flagship fund has outperformed the market while maintaining lower risk and volatility, as compared to the S&P 500.

As is standard in the alternative investment sector of the financial industry, Highline built its brand over the years through personal interactions and word of mouth, including through meetings with potential investors and investment consultants, by attending and speaking at industry events, and by seeking positive publicity in the trade and business press.[2]  Among Highline's recent successes in the media were that, in February 2015, Bloomberg Markets Magazine ranked Highline among the top 100 performing large hedge fund managers in the nation.  Also in 2015, Mr. Doft appeared on Bloomberg's television network, which is an effective way to promote the HIGHLINE brand because that network is viewed by potential investors.

Highline has taken numerous steps to protect the goodwill associated with its name and reputation.  In 2001, Highline received a federal trademark registration for its HIGHLINE word mark for "financial services in the nature of investment fund management."  That registration includes the information that Highline has used the HIGHLINE mark since 1995.  In 2009,

---

[1]    As of September 30, 2015, Highline had about $44 million in private equity investments in its portfolio.

[2]    Indeed, until very recently, alternative investment managers were prohibited from using traditional forms of advertising, and even now, alternative investment managers seek to build their reputation through word of mouth rather than mass media advertising.

Highline received a second federal trademark registration, this time for its logo which prominently features the HIGHLINE mark, also for "financial services in the nature of investment fund management" (collectively, the "HIGHLINE Marks").  Both registrations are valid, subsisting and incontestable and serve as conclusive evidence of Highline's ownership of the marks.  As a matter of law, these trademark registrations give Highline the "*exclusive* right to use" the registered HIGHLINE Marks throughout the United States in connection with financial services.  15 U.S.C. § 1115 ("the registration shall be *conclusive* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's *exclusive* right to use the registered mark in commerce") (emphasis added).  These registrations also operate, as a matter of law, to put third parties – including defendants – on constructive notice of Highline's trademark registrations.  15 U.S.C. § 1072.

　　　As part of its efforts to protect its brand, Highline has monitored the market to prevent infringing uses of the HIGHLINE mark.  Whenever it learns of a potential infringer whose use of a confusing name threatens to harm Highline's reputation, Highline has taken steps to protect its marks.  In most cases, Highline has been able to resolve these disputes amicably, with the infringer agreeing to change its name; when necessary, though, Highline has filed suit.

## II.　　High Line

　　　High Line was established in 2010 as a subsidiary of IAC.  When High Line selected its name, it knew that the name "Highline Capital" had already been taken, but neither it nor IAC ever conducted any trademark search or asked counsel whether it could use the name "High Line," despite the known existence of another entity called "Highline Capital."  There also is no record of High Line inquiring as to the nature of Highline Capital, or its location, or the services it provided.  Had High Line and IAC done a trademark search at that time, they would have

learned of Highline's two federal trademark registrations; had they done a simple search through an online search engine, they would have found Highline's website at <www.highlinecap.com>, which disclosed that it was an investment fund manager based in New York.

High Line manages millions of dollars in investments, primarily in early stage startup companies, which High Line describes as high risk investments that have the potential to earn high returns (though they also have the potential to result in a total loss of the investment). High Line finds its investments through word of mouth and personal interactions, such as by attending conferences and industry events or receiving emails and calls from companies who have learned about High Line and are seeking investors. Over the years, High Line has grown in both size and prominence; it now runs four venture capital investment funds that invest in early stage startups. High Line's investments are typically reported in the media, which has helped raise High Line's visibility in the marketplace.

High Line currently invests the money of only two investors – Ms. Fisher and IAC – but has reserved the right to actively seek new investors in the future. High Line's fund documents all include provisions that expressly permit High Line to accept money from third party investors, and High Line has not ruled out the possibility of opening its funds to new investors. Indeed, Ms. Fisher regularly receives calls from potential investors, including institutional investors, seeking to invest in her funds. Although she has not yet opened her funds to outside investors, she has told these third parties that she will let them know when she is ready to do so, and she has insisted throughout this litigation that she wants to ensure that she has the right to do so in the future. High Line has also discussed the possibility of creating "special purpose vehicles" for the purpose of accepting new investors when High Line exercises its right to invest additional funds in some of its investments in order to maintain its pro rata ownership stake.

### III.     The Dispute

Highline first became aware of High Line in mid-2014 when it received notice that Shana Fisher of High Line was speaking at a prominent hedge fund conference.  Highline has since learned of news reports touting startup investments made by High Line (sometimes misidentified as "Highline" or "Highline Capital") – generally highly speculative investments that are inconsistent with the cautious investments pursued by Highline.  For example, one article mistakenly identified "Highline Capital" as a company that would invest half a million dollars based solely on a back-of-napkin idea.  *See* Pl. Ex. 54 (Alyson Shontell, *These investors will give you $500,000 for a startup idea sketched on a napkin – no product needed*, Business Insider Indonesia, Apr. 14, 2015).

As Highline has done in other cases, upon learning of High Line, Highline reached out to High Line to express its objections.  When it became clear that High Line was not interested in reaching an amicable resolution, Highline filed the instant action to enforce its trademark rights and protect its reputation.

Both Highline and High Line have garnered recognition in the industry and the attention of the media.  Not all of that recognition has been good – High Line, for example, was an investor in Aereo, which declared bankruptcy after the Supreme Court found it liable for copyright infringement.  For Highline, maintaining its reputation as a cautious, research-based, successful investor is essential, as it is the cornerstone of keeping existing and attracting new investors.  Highline's reputation could be significantly damaged if consumers – *e.g.*, potential investors, analysts, advisors, members of the financial press, and others in the financial community – confuse it with High Line, causing Highline to lose control over the carefully curated reputation it has worked to build over the last twenty years.

7

## Argument

## I.  HIGH LINE HAS INFRINGED HIGHLINE'S TRADEMARKS.

To establish a claim under Sections 32 and 43 of the Lanham Act, Highline must show: "(1) that it has a valid mark that is entitled to protection under the Act, and (2) that use of [High Line's] mark infringes, or is likely to infringe" that mark.  *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 277 (S.D.N.Y. 1998).  Infringement can be demonstrated, *inter alia*, by showing that confusion is likely between the marks.

### A.  Highline's Trademarks are Valid.

Highline's federal trademark registrations evidence that its marks are valid, that Highline owns the marks, and that Highline has the exclusive right to use them in commerce. *K2 Advisors, LLC v. K2 Volatility Fund, LP*, No. 02 CIV. 3984 (AGS), 2002 WL 31235701, at *8 (S.D.N.Y. Oct. 4, 2002) (citing *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir.1999)); *see* 15 U.S.C. § 1115, 1057(b).  Moreover, because these marks have each been registered and in continuous use for at least five years, they have been granted "incontestable" status by the USPTO, which means, as a matter of law, that the registrations are "***conclusive*** evidence of the validity of the registered mark[s] and of the registration of the mark[s], of [Highline's] ownership of the mark[s], and of [Highline's] ***exclusive right to use*** the registered mark[s] in commerce."  15 U.S.C. §1115(b) (emphasis added); Pl's Exs. 9-10.  This means that, other than the handful of defenses specifically listed in 15 U.S.C. §1115(b), the validity of the HIGHLINE Marks cannot be challenged.  *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F. Supp. 96, 111–12 (S.D.N.Y. 1989).  Having not raised any of those

enumerated defenses (other than certain equitable defenses[3]), High Line cannot challenge the validity of Highline's registrations.

**B.      There is a Likelihood of Confusion between HIGHLINE and HIGH LINE.**

To prove infringement, Highline must show by a preponderance of the evidence that High Line's use of HIGH LINE is likely to cause confusion.  *See Kate Spade LLC v. Saturdays Surf LLC,* 950 F. Supp. 2d 639, 648 (S.D.N.Y. 2013).

Investors and members of the investment community are likely to misperceive that High Line's services originate or are associated with Highline.  To prove that confusion is likely, Highline does not have to show that prospective investors are likely to invest in the wrong company; confusion that results in harm to Highline's goodwill and reputation among other members of the investment community, such as the media, financial analysts, and journalists, is equally actionable.  *Morningside Grp., Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 141 (2d Cir.1999) ("evidence of actual confusion need not be limited to evidence of mistaken *completed* transactions. . . . courts can properly take into account evidence of 'either a diversion of sales, damage to goodwill, or loss of control over reputation.'") (citation omitted) (emphasis in original); *United States v. Hon*, 904 F.2d 803, 807 (2d Cir. 1990) ("we have recognized nonpurchaser confusion as relevant"); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The trademark laws are designed not only to prevent

---

[3]      High Line may attempt to raise equitable defenses, such as laches, waiver, estoppel and acquiescence, to defend against Highline's claim of infringement.  These defenses are groundless because they are each premised upon a trademark owner's purported relinquishment of its trademark rights against a junior user, either through delay or by express or implied consent, which has not occurred in this case.  Highline reached out to High Line as soon as it learned of High Line's infringing conduct and has from the very beginning insisted that High Line cease use of its infringing name.

consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.'") (citation omitted).

Confusion, moreover, is actionable under the Lanham Act even if that confusion is cured before a purchase or investment is made.  Otherwise, this type of confusion, known as initial interest confusion, would allow junior users, like High Line, to gain "crucial credibility" in the early stages of a prospective investment by piggybacking on the goodwill and reputation of senior users like Highline.  *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (finding likelihood of confusion because "[defendant] would gain crucial credibility during the initial phases of a deal"); *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1122 (S.D.N.Y. 1981) ("The law requires only that some form of confusion be proved likely, not that it be shown to persist and to cause lost sales.").

Confusion is even more likely to occur as the parties pursue their natural expansion strategies.  For Highline, that expansion may very well lead it to launch a stand-alone venture capital fund.  Highline already includes private equity and venture capital investments as part of its funds and, consistent with the trends at other hedge fund managers, Highline may in the future want to launch a standalone venture capital fund under its HIGHLINE name since it already has built an operation and a brand reputation that would allow it to do so.  For High Line, its natural expansion would be to open its investment funds to third party investors, a right that it already has built into its fund documents and a request that High Line has repeatedly received from outside parties.  These expansion plans will put the parties on a direct collision course.

When determining the likelihood of confusion between two marks, courts in the Second Circuit consider the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*:  (1) the strength of the trademark; (2) the degree of similarity between the two marks; (3) the competitive

proximity of the parties' products in the marketplace; (4) the likelihood that the parties will

bridge the gap, if any, between the products; (5) evidence of actual confusion; (6) good faith in

adopting the mark; (7) the quality of the products; and (8) the sophistication of the relevant

consumer group.  287 F.2d 492, 495 (2d Cir. 1961).  No single *Polaroid* factor is dispositive.

Instead, each factor must be considered in the context of the others and balanced to determine

whether a likelihood of confusion exists.  *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999,

1004 (2d Cir. 1983).  The balancing of these factors weighs strongly in favor of Highline.

### 1.    The HIGHLINE Marks Are Strong

"The 'strength' of a mark refers to its 'distinctiveness,' or, more precisely, its 'tendency

to identify the goods sold under the mark as emanating from a particular, although possibly

anonymous, source.'"  *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 278 (citation omitted).  When

evaluating the strength of a mark, courts consider two factors:  (1) the mark's inherent (or

conceptual) distinctiveness; and (2) the mark's distinctiveness in the particular marketplace.  *See*

*id.* at 278–283.  Both of these factors point to the strength of the HIGHLINE Marks.

When determining a mark's strength – *i.e.*, entitlement to protection – "courts in this

Circuit classify trademarks into one of four types.  In ascending order of protectability and

strength, the four types are: (1) generic, (2) descriptive, (3) suggestive and (4) arbitrary or

fanciful."  *K2 Advisors, LLC*, 2002 WL 31235701, at *9 (citing *Estee Lauder Inc. v. Gap, Inc.*,

108 F.3d 1503, 1508 (2d Cir. 1997)).  Arbitrary marks (as well as fanciful and suggestive marks)

are considered inherently distinctive and given full protection under the law.  *Id.*

The HIGHLINE Marks are arbitrary as used in connection with the investment

management services that Highline provides.  "A mark is arbitrary . . . if there is no logical

relationship whatsoever between the mark and the product on which it is used."  *Id.* (citation

omitted).  There is no logical relationship between the word "Highline" and the financial services

provided by Highline.  The HIGHLINE Marks were inspired by the names of two geographic

locations:  a ski trail in Vail, Colorado and a then-abandoned railroad spur in New York (which,

at the time Highline was founded in 1995, had not yet been developed into the High Line Park

and had minimal public recognition).  Neither the word nor the geographic locations have any

relation to, meaning in, or connotation in the financial services industry.  *See Lane Capital*

*Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 396 (S.D.N.Y. 1998) (finding

"Lane" to be arbitrary for financial services where it "does not have any strong connotations,

does not clearly identify with any particular individual, and does not describe the services

offered by its user."), *aff'd*, 192 F.3d 337 (2d Cir. 1999).  Highline, moreover, does not refer to

the geographic locations in its business or marketing.  *K2 Advisors, LLC*, 2002 WL 31235701, at

*9, 11 ("K2, as applied to plaintiff's business activities, is an arbitrary mark and is inherently

distinctive" because K2 "[did] not use[] the image of the mountain [after which it was named] to

promote the products and services that it provides to investors").  The HIGHLINE Marks are

thus entitled to full protection under the law.

The HIGHLINE Marks are also distinctive in the marketplace.  A mark's distinctiveness

in the marketplace "turns on 'its "origin-indicating" quality, in the eyes of the purchasing

public."  *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 278–79 (quoting *Lang v. Retirement Living*

*Publ'g Co.*, 949 F.2d 576, 581 (2d Cir.1991)).  Highline has taken steps to promote its brand and

has garnered favorable recognition in the media and the industry.  Highline is aware of no third

parties providing alternative asset management services that use the mark Highline or anything

confusingly similar thereto (other than those against whom Highline has taken steps to enforce its mark).[4]

## 2.   Highline and High Line Are Virtually Identical.

"High Line" is remarkably similar in "appearance, sound and meaning" to "Highline" and conveys the same overall impression, thereby satisfying the second *Polaroid* factor.  *See Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 552 (S.D.N.Y. 1996) (citation omitted). The test for determining similarity is whether the respective marks, when considered separately, convey the same general "overall impression" to the purchasing public.  *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 283–84 (*quoting Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)).  Here, the respective marks are identical but for a space between "High" and "Line." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 275–76 (S.D.N.Y. 2006) ("A variation as slight as an omitted space does not serve to create a legally recognizable distinction between De Beers and DeBeers.").  They also are pronounced identically—a fact that is particularly important since both companies market primarily through word of mouth.  *See Virgin Enters. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003) ("The reputation

---

[4]   High Line will be unable to substantiate at trial its contention that the HIGHLINE Marks have been weakened due to extensive third-party use of "Highline," or variations thereof.  *See Scarves by Vera, Inc. v. Todo Imps. Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) (the significance of third-party usage "depends wholly" upon proof that such usage is meaningful in the marketplace at issue).  Third party uses promoting "entirely unrelated products" are not "meaningful." *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 281 (quoting *Scarves by Vera*, 544 F.2d at 1173). Most of the third-party entities cited by High Line are either defunct or do business in unrelated sectors, and in the few instances where an entity arguably does operate in the financial services sphere, High Line will be unable to demonstrate  market significance.  Even if High Line could show meaningful third-party uses, a trademark owner need not "constantly monitor every nook and cranny of the entire nation and . . . fire both barrels of [its] shotgun instantly upon spotting a possible infringer." *Cullman Ventures, Inc. v. Columbian Art Works, Inc.*, 717 F. Supp. 96, 126-27 (S.D.N.Y. 1989) (alteration in original) (citation omitted); *see also Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 282 n.8 ("a trademark owner need only fight one trademark battle at a time"). *See generally*, Plaintiff's Motion in Limine, filed concurrently herewith.

of a mark also spreads by word of mouth among consumers.  One consumer who hears from others about their experience with Virgin stores and then encounters defendants' Virgin store will have no way knowing of the differences in typeface.").

High Line's expected argument that the marks are not similar because they must be read as a whole (with "Capital Management" and "Venture Partners," respectively) fails for a number of reasons.  ***First,*** both parties regularly refer to their respective funds as "Highline" and "High Line," without additional words; indeed one of Highline's registered trademarks is for "Highline" alone.  ***Second***, even when the marks are used with the additional words, there is no meaningful distinction under the Lanham Act because the additional words are not distinctive.  Although courts must consider trademarks as a whole in analyzing similarity, when a mark contains a dominant part or word, it is appropriate to give that part greater weight because it is likely to have a greater impact on consumers.  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:44; *see also N.Y.C. Triathlon, LLC v. N.Y.C. Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 317 (S.D.N.Y. 2010) ("The central and important part of each of the marks at issue is identical in appearance, sound, and meaning."); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898–99 (7th Cir. 2001) ("BEANIE" was dominant portion of senior mark BEANIE BABIES and junior mark BEANIE RACERS).  Moreover, it is well-settled that descriptive words like the additional words used by the parties in their full names do not dispel the risk of confusion.  *See e.g.*, *K2 Advisors, LLC*, 2002 WL 31235701, at *11 (addition of "capital" or "volatility" to "K2" does little to dispel likely confusion); *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 284 (despite addition of "Management Corporation" and "Capital Partners," court found "marks in question [were] virtually identical"); *Morningside Grp.*, 182 F.3d at 140 (finding "it clear that the similarity between the two names would be likely to cause confusion among ordinarily prudent

consumers in the investment world," in part because "Morningside" was the dominant word in both marks and "Capital" did "not serve any differentiating role").

Nor is the overwhelming similarity between the parties' marks diminished by the fact that the parties have different logos.  As discussed above, because both Highline and High Line market largely by word of mouth, the public will often encounter these marks only aurally, and will not see the differences in the logos.  *See K2 Advisors*, 2002 WL 31235701, at *12 (visual differences in stylized font of mark does not render marks dissimilar, where there is no evidence that potential investors would read or pronounce the words different); *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 284 (fact that defendants used its mark with a logo while plaintiff did not does not reduce confusion when potential investors are likely to encounter the marks only aurally). Further, the dominant aspects of each company's logos are the identical names "Highline" and "High Line."  *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 333 ("Where a mark contains both a design and a word, the word is generally considered to be dominant and is therefore accorded greater weight.").

### 3.    **Highline's and High Line's Services Are Proximate.**

Courts in this district have recognized that different submarkets within the field of financial services are proximate for the purposes of the *Polaroid* analysis.  *See, e.g.*, *K2 Advisors, LLC*, 2002 WL 31235701, at *13 (hedge fund and fund of fund considered proximate); *Lane Capital Mgmt.*, 15 F. Supp. 2d at 398 (hedge fund and investment advisor proximate), *aff'd*, 192 F.3d 337 (2d Cir. 1999); *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 285 (mutual fund management and brokerage services considered proximate).  Here, despite some differences between traditional hedge funds and venture capital funds, Highline and High Line are proximate because (1) they can appeal to the same customers, (2) they operate in the same markets, and (3)

they both serve the same purpose of seeking capital appreciation through alternative investments. *See Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 285.

"To establish proximity that is likely to cause confusion, a plaintiff need not establish that its products or services are identical to those offered by the defendant," but rather, that they "'are sufficiently related that customers are likely to confuse the source of origin.'" *Id.* at 284–85 (quoting *Scarves by Vera, Inc.*, 544 F.2d at 1173). Nor must the plaintiff establish "direct competition between the products" as a "prerequisite to relief." *K2 Advisors, LLC*, 2002 WL 31235701, at *13 (quoting *Mobil Oil*, 818 F.2d at 257). Instead, "[t]he key inquiry is whether a purchaser could easily assume that, while the investment products themselves are different, they belong to the same genre of products and might well have the same source." *Id.* (quotations and alterations omitted).

Highline and High Line are both New York-based investment fund managers that manage multiple alternative asset investment funds[5] under nearly identical names. Both offer services that can compete for the same pool of investment dollars from the same types of investors, and both exist to make equity investments in companies which, if profitable, create positive returns for their investors. They both make equity investments – in High Line's case, exclusively in private equity and venture capital; in Highline's case, as part of its larger fund (as of September 30, 2015, Highline had over $44 million of its assets under management invested in private equities, the majority of which are venture investments).

Although High Line currently has only two investors in its funds, its limited partnership agreements allow for the addition of outside investors and its representatives have acknowledged the possibility that it will seek additional investors in the future. Venture capital funds, like those

---

[5]    Alternative asset investments are those that extend beyond traditional equity (stock) or fixed income (bond) investments.

run by High Line, and hedge funds, like those run by Highline, attract the same types of

investors, including high-net-worth individuals and families and institutional investors such as

pension plans, endowments, unions, insurance companies and financial firms.  As such, hedge

funds and venture capital funds compete for investment dollars from the same pool of investors.[6]

Moreover, although Highline does not currently operate a separate venture capital fund, many

investment managers that manage hedge funds, including Tiger Global Management, Coatue

Management, and Maverick Capital, have recently initiated such funds under their same brands,

and Highline may well do the same in the years to come.  There is little doubt that investors

could believe that Highline has started a venture fund or simply that High Line's investments –

which are similar to investments Highline and other hedge funds make – were made by Highline.

The proximity between hedge funds and venture capital funds is also evidenced by the

fact that conferences are attended by representatives from both types of funds.  Indeed, Highline

first became aware of High Line because of Shana Fisher's speaking role at a prominent hedge

fund conference.

High Line is expected to argue that it is not proximate to Highline because it is not

providing services to "outside" investors and is, therefore, akin to an individual investing her

own money.  To the contrary, High Line offers services in a number ways, including to its

investors and to the companies in which it invests.  First, High Line is structured—like

Highline—███████████████████████████████████████████

---

[6]     Although certain large investors may have a dedicated staff focused on venture capital and a
different team focused on hedge funds, this is not universally true and is irrelevant to the
question at hand, which is whether investors could believe that Highline and High Line "have the
same source."  *See K2 Advisors, LLC*, 2002 WL 31235701, at *13.

███████████████████████████.[7]   Such fund management services are likely to be even more extensive if, as High Line has acknowledged is possible, it accepts additional outside investors in the future.  High Line also provides services to startup companies and co-investors, including investment and funding services, helping those companies find other investors, and consultation and business advice services.  These types of activities are considered to be services for purposes of the Lanham Act.  *See Morningside Grp.*, 182 F.3d at 137–38 ("Morningside Group has demonstrated that it renders services to others—including, for example, the businesses they acquire, the co-investors they attract and the United States institutions whose money they direct to Asian investments.").

**4.    Potential Investors Will Conclude That Highline Has Bridged Any Gap.**

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *THOIP v. Walt Disney Co.*, 736 F. Supp. 2d 689, 712 (S.D.N.Y. 2010) (quoting *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005)); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482 (2d Cir. 1996) (customers might not "perceive a gap at all" or might "assume that any gap has already been bridged").  The "bridging the gap" factor is closely related to the "proximity of the products" factor, but it considers "the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (quotation omitted).  The "bridging the gap" analysis "turns not so much on objective evidence of actual expansion or potential therefor

---

[7] ████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████

as it does on whether it is reasonable for the ordinary purchaser to assume such expansion."
*Dreyfus Fund Inc.*, 525 F. Supp. at 1119-20; *see also McGregor-Doniger Inc. v. Drizzle Inc*., 599
F.2d 1126, 1136 (2d Cir. 1979) ("Because consumer confusion is the key, the assumptions of the
typical consumer, whether or not they match reality, must be taken into account.").

In this case, there is little gap to bridge.  *See Gucci Am., Inc. v. Guess?, Inc*., 868
F.Supp.2d 207, 240 (S.D.N.Y. 2012) ("Where the companies target the same customers, there is
no gap to bridge, and this factor leans in favor of the plaintiff.").  Highline and High Line already
operate in the alternative asset space, they both make venture capital investments, and venture
capital funds and hedge funds compete for the same class of investors.

Further, while Highline has no immediate plans to open a separate venture capital fund, it
may very well do so in the future, as some other hedge fund managers have already done.  High
Line's misappropriation of the "High Line" name in connection with a venture capital fund
effectively forecloses Highline from making the natural extension of offering its own venture
capital fund under the name "Highline."  Moreover, the existence of a "High Line" venture
capital fund would surely cause confusion with Highline's venture fund no matter what Highline
named its fund.

In addition, even if Highline never opens a separate venture capital fund, the fact that
other hedge fund managers recently have done so increases the likelihood that consumers
encountering High Line's name will assume that Highline has joined this growing trend.  *See
Dreyfus Fund Inc.*, 525 F. Supp. at 1119–20.

### 5.    Actual Confusion Already Exists

"While . . . it is not necessary to show actual confusion . . . [t]here can be no more
positive or substantial proof of the likelihood of confusion than proof of actual confusion."
*Mobil Oil Corp.*, 818 F.2d at 259 (citation omitted).  Actual confusion is not limited to instances

of completed, mistaken transactions, but includes any instances of confusion from prospective investors and others in the financial services community. *Morningside Grp.*, 182 F.3d at 141 ("evidence of actual confusion need not be limited to evidence of mistaken completed transactions").

Two recent articles in financial publications mistakenly referred to High Line as "Highline Capital," and erroneously attributed High Line's investments and investing approach to Highline. First, in September 2015, *Crain's* misattributed High Line's investment in a startup called HowGood to "Highline Capital." Pl. Ex. 50. This confusion was compounded by the online publication *Technical.ly Brooklyn*, which republished the article. Pl. Ex. 52. Then, in April 2015, *Business Insider Indonesia* mistakenly identified "Highline Capital" (rather than High Line) as a company that would invest $500,000 based solely on a back-of-napkin idea. Pl. Ex. 54. The *Business Insider Indonesia* article was republished in multiple publications. Pl. Exs. 55-57, 59-60. Attributing such an impulsive approach to investment decisions to Highline detracts from the brand that Highline has built during twenty years of thorough research, prudence and integrity.

The fact that these articles were written by journalists covering the financial sector is itself compelling evidence of the inherent confusion between Highline and High Line. *See Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 356 (S.D.N.Y. 1998) ("evidence of actual confusion is significant" where sophisticated journalists and film reviewers wrote articles associating defendant's product with plaintiff's); *Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.*, 509 F. Supp. 1036, 1044 (S.D.N.Y. 1981) ("That a trio of independent journalists (two of them food writing specialists) reached the same erroneous conclusion concerning the nature of the

food processors now being sold, and Cuisinarts' status in the industry, is eloquent testimony to the misleading propensity of certain aspects of RC–I's campaign.").

In another instance, Shana Fisher spoke at a conference and a member of the audience, who was the founder of a startup and wrote a guide on getting investments, sent a tweet that misattributed her affiliation as Highline Capital.  Pl. Ex. 63:



Although Mr. Shen now characterizes his tweet as a mistake, he has no explanation for why he associated Ms. Fisher with "Highline Capital" and, in any event, followers of his tweet had no way of knowing that, when he wrote "Highline Capital," he really meant "High Line Venture Partners."

Other erroneous references to Highline show the clear potential for confusion.  In particular, at least twenty-five articles have misspelled "High Line" as one word, "Highline."  Pl. Exs. 72-98.  This increases the possibility that potential investors and others in the financial services field will perceive High Line's services to be connected with Highline.

The fact that these examples of confusion and potential confusion are not from investors does not affect the analysis.  As discussed above, confusion is relevant regardless of whether it arises from prospective consumers or others in the financial community.  As the Second Circuit stated:

> Recognizing the relevance of actual confusion beyond mistaken completed transactions is important here, because in the financial world an investor will almost never complete a transaction with a mistakenly identified party.  If nothing else, compliance with the due diligence requirement will normally prevent such errors.  But investors might be confused about the affiliation between two

> similarly named companies and might very well alter their
> behavior based on that confusion.

*Morningside Grp.*, 182 F.3d at 141; *see also Hon*, 904 F.2d at 807 ("we have recognized

nonpurchaser confusion as relevant").

### 6.    High Line's Lack of Good Faith

High Line does not even attempt to argue that it adopted its mark in good faith.  Nor

could it.  In trademark cases, good faith can be shown through conducting trademark searches or

relying on the advice of counsel prior to adopting of a mark.  *Flat Rate Movers, Ltd. v. FlatRate

Moving & Storage, Inc.*, No. 13 CV 0059 MGC, 2015 WL 1849834, at *4 (S.D.N.Y. Apr. 22,

2015).  High Line did none of those things.  High Line may argue that it had no malicious intent

against Highline, but the law is clear that "benign intent alone cannot vitiate the likelihood of

confusion."  *Lexington Mgmt. Corp.*, 10 F. Supp. 2d at 287.

At the time it adopted the "High Line" name, High Line was aware that "Highline

Capital" was already in use.  Not only did High Line decide to adopt the "High Line" name

anyway, but it did so without even conducting a trademark search to double-check the

availability of the "High Line" name.  That decision was particularly reckless given that High

Line's lawyers at IAC – who are sophisticated about the selection and protection of trademarks –

were involved in identifying whether the name was available and in registering the business

name with the Secretary of State.  "'Bad faith may be inferred from the junior user's actual or

constructive knowledge of the senior user's mark' although such knowledge does not, 'without

more, create an inference of bad faith."  *Flat Rate Movers, Ltd.*, 2015 WL 1849834, at *4

(citations omitted).  At the minimum, High Line's and IAC's actions demonstrate a marked

absence of good faith, if not evidencing recklessness and a disregard for the existing "Highline

Capital" name that constitutes bad faith.

**7.**    **The Quality of High Line's Services May Increase the Damage That Results From Confusion.**

The seventh Polaroid factor first "examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Grp.*, 182 F.3d at 142.

Highline has spent over twenty years building its brand and making sure that it offers quality services to its investors.  It has spent considerable effort in fostering a careful balance of risk and return in its portfolios and in building its reputation in the marketplace.  Even if High Line offers a comparable level of quality in its services, Highline has no control over the quality of High Line's services now or in the future.  Highline "is not required to put its reputation in defendant's hands, no matter how capable those hands may be." *Mobil Oil Corp.*, 818 F.2d at 260 (citation omitted).  That is especially the case in a situation like the one here publicity about High Line is so inconsistent with Highline's reputation.

**8.**    **Even Sophisticated Consumers Will Be Confused**

The final *Polaroid* factor – the sophistication of the parties' potential customers – also weighs in Highline's favor.  First, although there is no dispute that many of the potential investors in hedge funds and venture capital funds are sophisticated, "the fact that the consumers are sophisticated, including in the financial services field, is not a shield from liability." *K2 Advisors, LLC*, 2002 WL 31235701, at *14.  Even sophisticated investors may attribute information about High Line to Highline, gain initial interest in High Line on the basis of its name, or lose initial interest in Highline because of what they have heard about High Line.  Moreover, as noted above, financial sophistication does not necessarily connote typographic punctiliousness.

Furthermore, not all potential investors have a high level of sophistication.  For example, the SEC rules for determining accredited or qualified investors is based on net worth, not on the experience or savvy of the investor, so a sizeable number of people who invest in alternate asset investments do not have the same level of sophistication as, for example, a typical institutional investor.  Further, third parties and non-purchasers, such as journalists and others in the financial community, may be less sophisticated, may not have the benefit of due diligence, and may be more susceptible to confusion.  *Morningside Grp.*, 182 F.3d at 141.

High Line can be expected to argue that most investors in venture capital and hedge funds engage in a significant level of due diligence before they invest, which means that there is little chance that an investor will mistakenly invest in the wrong fund.  This argument misses the mark.  The law on confusion does not require Highline to prove that a potential investor would actually invest in the wrong fund.  *See id.* at 141 ("evidence of actual confusion need not be limited to evidence of mistaken *completed* transactions[;] . . . courts can properly take into account evidence of 'either a diversion of sales, damage to goodwill, or loss of control over reputation.'") (citation omitted; emphasis in original).  There are over 10,000 hedge funds and venture capital funds in existence; even the most diligent investor cannot do due diligence on all of them.  It follows that investors must make choices to winnow the field, and those initial determinations are often influenced by characterizations about a fund or investment manager conveyed  by word of mouth, news articles, or reports of  presentations at conferences. Highline's concern is that potential investors may eliminate Highline from consideration even before they get to the due diligence stage based on something they may have heard about High Line and misattributed to Highline.  *K2 Advisors, LLC*, 2002 WL 31235701, at *14 ("the sophistication of the investors does not mitigate" the risk of investors "eschewing opportunities

to meet with plaintiff and to learn about its products because of the word-of-mouth association"
with defendants, as well as a risk that plaintiff would "lose control of its reputation").

9.      **Balancing of the *Polaroid* Factors Weighs Heavily Against High Line.**

These factors, taken together, weigh heavily in favor of a finding of a likelihood of
confusion.  HIGHLINE and HIGH LINE are virtually identical and are both being used in
similar and overlapping segments of the financial services market.  It is likely that members of
the investment community and prospective investors would confuse Highline for High Line or
vice versa—and indeed there are already articles and a social media post evidencing actual and
potential confusion.  This potential for confusion is exacerbated by the fact that hedge fund
managers and hedge funds are bridging the gap to enter venture capital territory the past few
years, and it would not be unreasonable for Highline to join that trend, or at least for consumers
to believe it has done so.  Although it is true that many investors in hedge funds and venture
capital funds are sophisticated as investors, not all are alert to the difference between Highline
and High Line, and sophistication would not insulate consumers from all confusion.  The balance
of these factors favors Highline.

C.      **High Line is Liable for Trademark Infringement and Unfair Competition
        Under New York Common Law.**

The analysis of trademark infringement and unfair competition under New York common
law is effectively the same as that for infringement under the Lanham Act, except that bad faith
is required to prove unfair competition (but not trademark infringement) under the common law.
Because Highline has proved trademark infringement under the Lanham Act and that High Line
adopted its name in bad faith, it has also established the elements of common law trademark
infringement and unfair competition.  *Nike, Inc. v. Top Brand Co.*, No. 00 Civ. 8179 KMW RLE,
2005 WL 1654859, at *7 (S.D.N.Y. July 13, 2005) (citing *Standard & Poor's Corp. v.*

25

*Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982)); *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 220 F. Supp. 2d 289, 298 (S.D.N.Y. 2002).

### D.      Highline is Entitled to a Permanent Injunction.

High Line's continued use of HIGH LINE is causing confusion in the marketplace and undermining Highline's carefully crafted reputation.  A permanent injunction is appropriate because "(1) '[the plaintiff] is likely to suffer irreparable injury in the absence of an injunction'; (2) 'remedies at law, such as monetary damages, are inadequate to compensate for that injury'; (3) the balance of hardships tips in his favor; and (4) 'the 'public interest would not be disserved' by the issuance of a preliminary injunction.'"  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (quoting *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

Highline has suffered irreparable harm because of the loss of control over the reputation of its trademark, a loss which is "neither 'calculable nor precisely compensable.'"  *U.S. Polo Ass'n*, 800 F. Supp. 2d at 540 (quoting *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 343).  For Highline, maintaining its reputation as a cautious, research-based, successful investor is essential, as it is the cornerstone of keeping existing and attracting new investors.  Highline's reputation could be significantly damaged if potential investors, analysts, advisors, members of the financial press, and others in the financial community confuse it with High Line and its different way of investing and operating.

As a result of High Line's infringement, Highline has lost control over its reputation and goodwill, which it has carefully crafted for over two decades.  As discussed above, even the misattribution of positive information about High Line could cause Highline irreparable harm if it is inconsistent with Highline's brand and reputation.  For example, Highline would never invest $500,000 based solely on a back-of-napkin idea; publicity suggesting that it would do so

could cost it investors who are put off by such a method of investment.  For this reason, any publicity about High Line that is attributed to Highline threatens the work Highline has done building a brand that stands for thoroughness, prudence and integrity.

The harm is particularly serious here because reputation and identity have "special importance" in the financial industry.  *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 323 (3d Cir. 2015).  High Line's investments are, by their nature, highly risky, and venture-backed startups frequently fail—failures that are often highly publicized.  For example, High Line was an investor in Aereo, an investment that lost all value when Aereo shut down because it was found to be an infringer.  Consumers confused between Highline and High Line may quite reasonably believe that it was Highline that made those bad investment decisions.

Moreover, "losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable," *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541, and there is no way for Highline to identify prospective investors who turn away from Highline based on an erroneous perception of its reputation.  *Morningside Grp.*, 182 F.3d at 141 (There is "no effective way to measure the loss of sales or potential growth—to ascertain the people who don't knock on the door.").  This type of reputational harm, although not quantifiable, is irreparable and can only be prevented through an injunction.  *See U.S. Polo Ass'n*, 800 F. Supp. 2d at 541.

The balancing of equities also strongly favors an injunction.  In contrast to the extensive harm that would result to Highline if High Line were allowed to continue infringing, there would be little to no burden on High Line from being ordered to change its name, as it has been in business for only five years and it has not yet begun to solicit outside investors; indeed, it is comprised of only two investors at the moment.  In any event, by choosing to adopt its name after Highline had already been using its mark for fifteen years, knowing that Highline was in

27

use, High Line "took a calculated risk" and did so at its own peril. *Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15 CV 1092 JMF, 2015 WL 845711, at \*8 (S.D.N.Y. Feb. 26, 2015).

Finally, since "trademark law exists, in part, to prevent frauds upon the public," an injunction would serve the public interest by preventing confusion. *Victorinox AG v. B & F Sys., Inc.*, No. 13 CIV. 4534 JSR, 2015 WL 5440670, at \*3 (S.D.N.Y. Sept. 8, 2015). "The consuming public has a protectable interest in being free from confusion, deception and mistake." *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541.

## CONCLUSION

For the foregoing reasons, Highline respectfully requests that the Court enter judgment in its favor and permanently enjoin High Line from using "High Line" or any variation thereof.

Dated:      New York, New York
            November 16, 2015

                                    DEBEVOISE & PLIMPTON

                                    By  /s/ *Matthew E.Fishbein*
                                    David H. Bernstein
                                       (dhbernstein@debevoise.com)
                                    Matthew E. Fishbein
                                       (mfishbein@debevoise.com)
                                    Megan K. Bannigan
                                       (mkbannigan@debevoise.com)
                                    David Sandler
                                       (dsandler@debevoise.com)
                                    Zheng Wang
                                       (zwang@debevoise.com)
                                    919 Third Avenue
                                    New York, New York  10022

TANNENBAUM HELPERN SYRACUSE
& HIRSCHTRITT LLP

L. Donald Prutzman
900 Third Avenue
New York, New York 10022
(212) 508-6700

*Attorneys for Highline Capital Management, LLC*